# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 CR 1079 | **DATE** | 8/14/2003 |
| **CASE TITLE** | USA vs. Michael Neuendank | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth on the attached Memorandum Opinion and Order, the Court denies defendant's motion to dismiss the indictment.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | AUG 21 2003 date docketed | 26 |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| OR | courtroom deputy's initials | 03 AUG 21 AM 10:41 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | Case No. 02 CR 1079 |
| ) | |
| MICHAEL NEUENDANK ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Michael Neuendank, who is charged with mail fraud, has moved to dismiss the indictment for allegedly prejudicial pre-indictment delay. For the reasons stated below, the Court denies Neuendank's motion.

### Facts

Neuendank was indicted for mail fraud on November 7, 2002. The indictment alleges that between 1996 and February 1998, Neuendank schemed to defraud his former employer, Progressive Manufacturing Corporation, of money, property, and the right to his honest services. Specifically, the indictment alleges that Neuendank, who was PMC's controller, circumvented the company's computerized check generation system and issued company checks payable to himself and to American Express (the latter to pay personal credit card bills), used a signature stamp with the name of a PMC officer to "sign" the checks, and created false entries in the company's books and made other false statements to conceal the fraud. By these means, the indictment alleges, Neuendank obtained PMC funds totaling about $450,000.

Neuendank was interviewed by FBI Special Agents James Reilly and Diane Rivers at his home on April 6, 1998, about six weeks after he had been fired by PMC following its discovery

of the alleged fraud. Reilly's memorandum summarizing the interview reports that Neuendank admitted writing PMC checks to pay personal American Express card bills and stated that he had incurred the charges to pay for gifts for, and the wedding reception of, a PMC employee named Daniel Gajewski whom he had befriended in the summer of 1997. Neuendank also admitted that he had written PMC checks to himself. He stated that he had written one such check to assist Gajewski to pay for training at a technical school and several others to pay Gajewski's rent. He further stated that Gajewski had introduced him to his brother and the brother's wife, and that he (Neuendank) had also written a PMC check to the wife's landlord. Neuendank stated that he considered his payments to the Gajewskis to be "loans," though they had not been repaid.

Neuendank also told the agents that a significant portion of the funds that he had obtained from PMC – somewhere between $10,000 and $30,000 – was intended to reimburse himself for expenses he claimed to have incurred to pay for renovations at PMC's facilities. He stated that he did not know whether his supervisor had been aware that he had incurred these expenses or had reimbursed himself for them.

Neuendank reported that he had been fired from PMC and that shortly after that he had attempted suicide, resulting in a lengthy stay at St. Francis Hospital in Evanston. He also advised that he was being counseled by a psychologist and a psychiatrist.

Neuendank stated that he had written the checks manually so that he "could do what [he] did." He advised that the checks had been removed from PMC's records. Though he said he could not recall doing this, he stated that it was possible he had done so. Neuendank told the agents "that his psychologist thinks that the whole situation was very overwhelming to him and that he can only remember certain things he did and not other things he did." He reported that he

was working with his attorneys, Luke DeGrand and Larry Lauter, to reconstruct how much money was involved. He said that PMC contended that he had written about $450,000 in unauthorized checks; Neuendank said he recalled writing around $200,000 to $250,000 worth of checks and did not know what accounted for the remainder.

On March 10, 1998, prior to interviewing Neuendank, Agent Reilly had interviewed PMC's CEO and general manager. These individuals provided Reilly with a detailed rendition of the alleged scheme, including a schedule of converted checks, a detailed description of how the scheme was concealed, identification of the bank accounts in which Neuendank had deposited the checks, and the fact that much of the money had been used to benefit Daniel Gajewski. Following the Neuendank interview, Reilly interviewed Daniel Gajewski on July 1, 1998 and Gajewski's wife Tracy Gajewski on June 1, 1998. Both stated that they had received substantial gifts and sums of money from Neuendank. Daniel reported that Neuendank had told him that he should consider Neuendank to be his father and that he would take care of Daniel and his family. Gajewski also told Reilly that Neuendank had loaned his brother Andrew Gajewski money to pay some outstanding bills. The government contends that Reilly attempted to interview Andrew, but he balked. The investigation then evidently went onto the back burner.

At some unknown point in 1998, PMC filed a civil lawsuit against Neuendank in state court. Neuendank, represented by counsel, reached a settlement of the case in December 1998. He agreed to make an initial payment of $13,000 to PMC, followed by monthly payments of $800 until the entire debt was paid. Neuendank has met his obligations under the agreement thus far.

In the latter part of 1999, Reilly appears to have briefly worked on the investigation

3

again; in late October of that year, he interviewed Andrew Gajewski, whom he had allegedly been unable to interview in 1998. But after that, the government says, from late 1999 through early 2000, Reilly worked on another fraud case and evidently returned the Neuendank matter to the back burner. In May and June 2000, Reilly met with Assistant United States Attorney Steven Heinze and discussed what records from PMC and banks were needed to complete the investigation and seek an indictment. In late June, Reilly prepared a chart of the PMC checks generated by Neuendank that he had identified to date. In the latter half of 2000, Agent Reilly had several contacts with PMC's attorney, seeking additional information regarding PMC's investigation of the matter as well as copies of additional checks. Reilly met with Heinze in the fall of 2000, and they identified possible mail fraud counts that could be asserted against Neuendank.

On November 29, 2000, Heinze prepared a letter addressed to Neuendank advising him that he was under investigation and should consider hiring counsel, and that he should contact Heinze as soon as possible. If Neuendank did not do so by December 8, Heinze stated, he would "begin the process of filing criminal charges." Heinze directed Reilly to hand deliver the letter to Neuendank. On December 6, 2000, Reilly advised Heinze that he had been to Neuendank's home twice but had been unable to deliver the letter. Heinze then prepared a second letter to Neuendank, which he mailed on December 6. The letter was identical to the first, except that it said that the process of filing charges would begin unless Neuendank or his attorney contacted Heinze by December 15. Heinze heard nothing in response to the letter, and the letter was not returned as undeliverable. He assumed that Neuendank had elected not to respond. However, despite Heinze's warning that he would initiate charges by mid-December 2000, the matter once

4

offense. Wasyliw and Okuleye made extensive reports in which they concluded that Neuendank was fit to stand trial, but that he suffered from a psychiatric disorder referred to as schizoid personality disorder with passive-dependent and avoidant personality traits. The Fourth Edition of the Diagnostic and Statistical Manual of the American Psychiatric Association (DSM-IV) says that schizoid personality disorder consists of a pervasive pattern of detachment from social relationships and a restricted range of expression of emotions in interpersonal settings, characterized by a desire to engage in solitary activities, emotional detachment, lack of close friends and confidants other than relatives, and disinterest in relationships and sexual activity with others. Avoidant personality disorder is defined in DSM-IV as a pattern of social inhibition, feelings of inadequacy, and hypersensitivity to negative evaluation; dependent personality disorder is defined as a pervasive need to be taken care of that leads to submissive and clinging behavior and fear of separation. Dr. Wasyliw also indicated that there was some possibility that Neuendank might be suffering from an "adjustment disorder" with anxiety and a depressed mood, or a "dysthymic disorder." The former involves the development of anxiety and a depressed mood in response to an identifiable stressor, and the latter involves experiencing a chronically depressed mood for an extended period.

In his evaluation, Dr. Wasyliw indicated that Neuendank's memory regarding his suicide attempt "was very sparse" and that his memory generally appeared to function below expectations for a person of his above-average intellectual level. Dr. Wasyliw concluded that this impairment appeared genuine, not feigned or exaggerated. He also stated that Neuendank tended to deny emotional problems, minimized personal difficulties, and attempted to portray himself in a socially desirable manner despite his awkwardness and "negative self-concept." He

6

again went onto the back burner.

Between March 2000 and his retirement from the FBI in September 2002, Reilly was occupied with another fraud investigation that the government claims took most of his time. Reilly was also assigned to O'Hare Airport for two months following the September 11, 2001 terrorist attacks on New York City and Washington, D.C, and he was involved in terrorism-related investigations outside of Chicago in November and December 2001 and again in January and February 2002. It does not appear that any other agent was asked to work on the Neuendank investigation at any time during this period.

Heinze met with Reilly in April 2002 and again in August 2002 to discuss what charges could be returned and what investigative steps remained to be done. However, it appears that none of those steps (whatever they were) were taken in the months that remained prior to Reilly's retirement from the FBI in September 2002. Upon Reilly's retirement, the investigation was reassigned to Special Agent David Crawford. Crawford conducted interviews with PMC employees to determine what false records Neuendank had created; these interviews essentially replicated those that Reilly had conducted in March 1998. Crawford also interviewed American Express and Postal Service employees regarding the "mailing" element of the mail fraud charges that were eventually returned. As noted earlier, Neuendank was indicted on November 7, 2002. The indictment included two mail fraud charges, based on mailings claimed to have taken place on November 10 and December 9, 1997.

Following his indictment, Neuendank was evaluated at the request of his counsel by psychologist Dr. Orest Wasyliw and psychiatrist Dr. Babatunde Okuleye of the Isaac Ray Forensic Group regarding his fitness to stand trial and his mental state at the time of the alleged

5

concluded that Neuendank "demonstrates a substantial vulnerability to impairment of his capacity to perceive reality appropriately," specifically that he tends to misperceive events and form mistaken impressions of others and their actions and "tends to deal with challenging situations in an escapist manner in which he subjugates reality to fantasy." These deficits, Dr. Wasyliw reported, "are likely to result, at times, in instances of poor judgment in which he fails to anticipate the consequences of his actions and misconstrues what constitutes appropriate behavior."

Dr. Wasyliw reported that Neuendank had denied memory for much of the conduct for which he had been indicted. He characterized Neuendank's description of his reasons for taking the money as "insufficient to allow a full and comprehensive assessment of his mental state at the time of the crime, or to fully assess any possible exacerbating or mitigating circumstances" – for example, the extent to which his traits of dependency or his "predispositions to fantasy preoccupations" had contributed to the offense or had distorted his understanding of his relationship with Daniel Gajewski. Dr. Wasyliw stated that he could not rule out the possibility that Neuendank's limited memory for these events was "selective and self-serving," but he indicated that the apparent selectivity of memory was not entirely self-serving and "includes elements of intense psychological repression." He stated that "[i]t is possible that a more comprehensive and complete assessment could have been accomplished, if it had been conducted closer in time to the offense."

**Discussion**

Neuendank has moved to dismiss the indictment, alleging that he has been significantly and unfairly prejudiced by the government's allegedly unjustified delay in returning charges. *See*

7

*generally United States v. Lovasco,* 431 U.S. 783 (1977); *United States v. Sowa,* 34 F.3d 477, 450-52 (7th Cir. 1994). The primary protection against delay afforded to an accused is the statute of limitations. *See United States v. Marion,* 404 U.S. 307, 322 (1971). It is well established, however, that the due process clause of the Fourteenth Amendment provides additional protection beyond that afforded by the statute of limitations. *Id.* at 324; *Lovasco,* 431 U.S. at 789.

Neuendank contends that the government had no legitimate investigatory justification for the four-plus year delay following its complete, or near-complete, knowledge of the circumstances of the offense as of mid-1998. He alleges that he was prejudiced by the government's delay in three specific ways. First, Neuendank says that he settled the civil case believing, or at least assuming, that the criminal investigation had been resolved. He contends (though he supplies no affidavit or other evidence to this effect) that if the government had indicted this case in a timely manner, he would have asserted his Fifth Amendment privilege against self-incrimination in the civil case until the criminal matter had been resolved. Instead, he settled the matter, thus handing the government evidence that it intends to use at trial to prove his guilt. Second, Neuendank argues, although the unusual circumstances of the offense suggest that it may have been the product of a mental disease or defect, the lapse of time combined with his memory loss have made it impossible for him to investigate the offense fully or to be evaluated properly regarding his mental state at the time of the offense. Third, Neuendank argues, these same factors have made it impossible to reconstruct his mental state at the time of his April 1998 statement to the FBI, thus preventing him from seeking to suppress the statement or put it in context.

The manner in which this investigation was allowed to gather dust after the government had more than enough evidence to establish probable cause and initiate charges could be held up as a model of how *not* to do it. Deterrence and retribution, two of the important goals of our criminal justice system, are impaired when the government lets an investigation languish. If Neuendank ultimately is convicted, punishment will not be meted out until well over six years after the offenses were completed. It would border on the delusional to suggest that punishment imposed after such a delay is likely to deter others from committing crimes. *See United States v. Ashford*, 924 F.2d 1416, 1426 (7th Cir. 1991). But there is more to it than that. Retribution, ordinarily a just and proper goal of a criminal justice system, can be stripped of its legitimate meaning when undue delay occurs: imposition of severe punishment after unjustified delay can seem more cruel than just, particularly when the offender has led a law-abiding life in the interim. Undue delay can also impair the system's accuracy: memories fade over time, witnesses move on, evidence becomes stale, and all of this may, in a given situation, impair the prosecution's case, the defendant's case, or both.

Mere delay, however, does not suffice to warrant dismissal of an indictment on due process grounds. Rather, in this Circuit at least, the defendant must make a threshold showing of concrete and substantial prejudice; if he does so, the government must explain the delay, and the court then balances the justification against the defendant's prejudice. *Sowa*, 34 F.3d at 450; *see also, e.g., United States v. Miner*, 127 F.3d 610, 615 (7th Cir. 1997). Delay necessitated by investigative needs does not deprive an accused of due process even if his defense "might have been somewhat prejudiced by the lapse of time." *Lovasco*, 431 U.S. at 796.

The government has been given two chances to explain its four-year delay in returning

9

charges; both times it has used these opportunities primarily for the purpose of filing additional, unauthorized briefs regarding the issue of prejudice. Nonetheless, what emerges from the government's submissions is that the investigation was repeatedly shelved because the investigator was pursuing other matters perceived to be more important or pressing. The suggestion apparently is that FBI agents can work on only one thing at a time – an absurd proposition. It is beyond question that the investigative resources of law enforcement agencies and prosecutor's offices are limited and must be prioritized. But it appears to the Court that the only thing that spurred the return of the indictment against Neuendank was the original investigating agent's retirement, combined perhaps with the impending expiration of the statute of limitations on certain possible mail fraud charges.

The government has made no effort to show that the FBI's resources were so severely taxed from 1998 through 2002 that *no one* could pursue the matter on reassignment or otherwise, or conversely that it was reasonable simply to let the matter gather dust until the clock was about to run out. On the other hand, there is no basis on the current record to believe that the government acted for tactical advantage, or even that it was aware of any specific way in which Neuendank would be harmed, or the government advantaged, by delay. Although it is conceivable that Neuendank could elicit something along those lines at a hearing, the Court sees no need to hold a hearing, for as we explain below, Neuendank has failed to demonstrate the type of prejudice that *Sowa* requires to justify dismissal.

Neuendank's settlement of the civil lawsuit in 1998, allegedly under a misapprehension that the criminal investigation had been concluded, cannot be considered to be prejudice that was caused by the government's unreasonable delay. At that point, the delay following the discovery

10

of the alleged fraud was modest enough that no reasonable person in Neuendank's position – at least not someone who, like Neuendank, was represented by competent counsel – would have regarded it as indicating that the authorities had decided not to file charges. To put it another way, assuming Neuendank actually believed that criminal charges were no longer forthcoming at that time, his belief was unreasonable.[1]

By contrast, Neuendank has supported his contention that his memory of the events at issue is impaired. Though the matter is not beyond dispute, Dr. Wasyliw concluded that Neuendank suffers from an actual impairment of his memory. Neuendank has also supported his claim that his memory deficits impair his ability to examine, or present evidence regarding, his mental state at the time of the offense, as well as at the time of his statement to the FBI. It was for this reason that the Court directed the government to explain its delay.

Upon further examination, however, Neuendank's claims are insufficient to warrant dismissal of the indictment. First, he has failed to demonstrate that his ability to investigate the underlying charges or his mental state has been *substantially* impaired because of the government's undue delay. To do that, Neuendank would have to show that his ability to investigate the charges, including his mental state at the time, is significantly decreased now compared to what it would have been had the government filed charges within a reasonably prompt period after it had obtained the necessary evidence. That does not mean February, March, or April 1998. No reasonable person, at least no knowledgeable one, expects that charges in a fraud case, particularly one involving an extended scheme like this one, will be returned

---

[1] This discussion is not intended to preclude Neuendank from seeking to exclude evidence of the settlement on other grounds.

instantaneously. Time (in some cases a significant amount of it) is reasonably required to obtain documentation of the fraud and its proceeds, interview victims, potential participants and other witnesses, and pursue leads that arise during the investigation – such as PMC's and Neuendank's disclosure that Daniel Gajewski had received or benefitted from a significant amount of the proceeds of the alleged fraud. That disclosure suggested that Gajewski himself might have exposure and thus warranted follow up to determine his involvement or lack thereof. All of this legitimately required a number of months to complete. For these reasons, no reasonable argument can be made that the government was required to return charges before Neuendank's interview in early April 1998, a scant six weeks after PMC had reported the alleged fraud.

Reilly's memorandum of his April 1998 interview of Neuendank reveals that Neuendank's memory regarding the underlying events was already significantly impaired at that early stage – or at least Neuendank claimed it was. Dr. Wasyliw's summary of his 2003 interview with Neuendank likewise reveals memory deficits regarding some aspects of the alleged scheme and good memory regarding other aspects. Dr. Wasyliw's summary is less detailed than Reilly's, but on the record before the Court we cannot say that this reflects materially greater memory impairment in 2003 than in 1998; it is just as likely that it resulted from Dr. Wasyliw's need for less detail than the agents had elicited. In sum, even if Neuendank had been indicted in the latter part of 1998, his memory regarding the events already would have been significantly impaired in a way not attributable to undue delay by the authorities. Neuendank has not established any particular way in which his memory is substantially more impaired now than it was at that time.

The Court acknowledges Neuendank's argument that it has become more difficult for him

12

to reconstruct his mental state at the time of the alleged offense to determine whether he can assert a defense based on a claim of mental disease or defect. But retrospective determinations of the mental state of an accused are the bread and butter of forensic psychiatry and psychology. Neuendank has not demonstrated that his ability to investigate his mental state has been substantially prejudiced by the government's delay; Dr. Wasyliw's equivocal statement that it is *possible* that a more comprehensive assessment could have been done at an earlier time is not enough.[2]

We deal finally with Neuendank's contention that his ability to examine the circumstances under which he gave the April 1998 statement has been impaired by the government's delay in bringing charges. It is difficult to assess whether this impairment results from the delay, or whether it is a result of Neuendank's apparent psychiatric disorder(s), involuntary repression, or some voluntary factor. No determination of the cause of the impairment could be made without holding a hearing. But even if Neuendank were to show that he is hindered in contesting the statement or its circumstances due to the government's allegedly undue delay, that would not entitle him to dismissal of the indictment. The nature and scope of the remedy for a violation of constitutional rights is determined by the violation; the goal is to put the victim of the violation in "the position [he] would have occupied in the absence of [the violation]." *United States v. Virginia,* 518 U.S. 515, 547 (1996) (quoting *Milliken v. Bradley,*

---

[2] It does not appear that reasonably diligent steps have been taken to try to track down the psychologist who treated Neuendank in 1998 following his suicide attempt to determine what she can report regarding his mental state at the time. All we have is a brief, unexplained reference in Dr. Wasyliw's report that he could not locate her.

13

433 U.S. 267, 280 (1977)).[3] The responsibility of a court upon finding a constitutional violation is "to construct a remedy . . . that is tailored to the injury caused by the violation." *United States v. All Assets & Equipment of West Side Building Corp.*, 58 F.3d 1181, 1193 (7th Cir. 1995). Thus if the government's unreasonable delay actually were shown to impair Neuendank's ability to challenge or explain his April 1998 statement to the FBI, that would, at most, entitle him to seek the statement's exclusion from evidence, whether pursuant to principles of due process or Federal Rule of Evidence 403 (on the grounds that the unfair prejudice from the statement's admission substantially outweighs its probative value).

In sum, because Neuendank has failed to show that his defense has been substantially impaired by the government's delay in bringing charges, we need not conduct the balancing test required by *Sowa*.

## Conclusion

For the reasons stated above, the Court denies defendant's motion to dismiss the indictment. The case remains set for status hearing on August 15, 2003 at 9:30 a.m. for the purpose of setting a trial date.

*[signature]*
MATTHEW F. KENNELLY
United States District Judge

Date: August 14, 2003

---

[3] *Milliken* and the cases upon which it relied for this proposition all involve issues concerning complicated equitable relief. But the Seventh Circuit has applied this same principle outside that particular context; the *All Assets* case, cited in the text, was a civil forfeiture case. And in any event, dismissal of an indictment and exclusion of evidence can be considered to be forms of equitable relief for constitutional violations.

14